UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X Docket No.:
ERIN PETTERSEN,

                                Plaintiff,

    -against-                                    **COMPLAINT**

VOLCANO CORPORATION,
PHILIPS ELECTRONIC CORPORATION
NORTH AMERICA, AND SCOTT HUFF
(in his individual capacity)                  **PLAINTIFF DEMANDS**
                                                              **A JURY TRIAL**

                                Defendants.
-------------------------------------------------------------X

Plaintiff ERIN PETTERSEN, by and through her undersigned attorneys, respectfully complains as follows:

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343, and supplemental jurisdiction over Plaintiff's State and City claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this case pursuant to 28 U.S.C. § 1391.

3. Plaintiff filed with the E.E.O.C. on or about February 13, 2017.

4. Plaintiff received her Right to Sue Letter on or about March 6, 2018.

5. Plaintiff satisfied all administrative prerequisites and is filing this lawsuit within ninety (90) days of receiving her Right to Sue Letter.

## PARTIES

6. Plaintiff ERIN PETTERSEN (hereinafter "Plaintiff") is a forty-six (46) year old woman who resides in East Hampton, New York.

7. Defendant PHILIPS ELECTRONIC CORPORATION NORTH AMERICA (hereinafter "PHILIPS") is a multinational corporation licensed to do business in New York State.

8. At all times relevant herein, Philips is Plaintiff's "employer" as that term is defined by all relevant statutes.

9. Defendant VOLCANO CORPORATION ("VOLCANO") is a wholly owned subsidiary of PHILIPS and is licensed to do business in the State of New York.

10. At all times relevant herein, Philips is Plaintiff's "employer" as that term is defined by all relevant statutes.

11. Defendant SCOTT HUFF ("HUFF") is an "employee" of Philips as that term is defined by all relevant statutes.

12. At various times referenced below, Defendant Huff was Plaintiff's direct supervisor.

## FACTS

13. Defendants hired Plaintiff around January of 2014.

14. In or around February of 2015, Volcano was acquired by Philips.

15. By way of history, Plaintiff initially interviewed with Volcano in 2009.

16. At that time, Plaintiff was interviewed by Defendant Huff.

17. When Plaintiff arrived for her interview, Huff repeatedly attempted to get Plaintiff to come to his hotel room for the interview.

18. Plaintiff, refused Defendant Huff's advances and the position was ultimately awarded to a male, Greg Morselli (hereinafter "Morselli").

19. When Morselli eventually left his employment with Volcano, Plaintiff was called back for a second round of interviews with Huff in November of 2013.

20. During the interview, Huff insisted on taking Plaintiff out to lunch, where he made many unwelcome comments about her appearance, which made Plaintiff uncomfortable.

21. At the time of her hire with Volcano, Plaintiff worked under the supervision of David Donatello. Both Donatello and Huff are regional managers possessing equal authority.

22. Despite her working directly for Mr. Donatello, Huff made it a point to target Plaintiff.

23. Upon information and belief, Huff targeted Plaintiff due to her refusal to engage in a physical relationship with him.

24. Furthermore, upon information and belief, Huff demonstrated a pattern of systematically harassing female subordinates while favoring male employees.

25. In or around August 2014 at Volcano's mid-year meeting – at which the entire Volcano team was in attendance – Huff approached Plaintiff at the hotel lounge being used by the Volcano team.

26. During this encounter, Huff appeared to be intoxicated and proceeded to berate Plaintiff and subject her to a number of attacks on her character.

27. Huff did not single out or reprimand any male employees during this interaction.

28. Huff claimed that he was settling a squabble between Plaintiff and other employees but none of the employees in question, including Plaintiff, were under Huff's supervision at that time.

29. Furthermore, Huff deliberately exaggerated the situation to make himself look good. The truth of the matter was Huff approached Plaintiff while she was having a friendly conversation with two other territory managers, Mark Cicero and Joseph Mandziuk. Huff approached Plaintiff and stood uncomfortably close to Plaintiff and called Plaintiff incompetent in front of Cicero, Mandziuk, and others. Plaintiff was understandably embarrassed and politely excused herself from the situation.

30. Plaintiff never witnessed Defendant Huff act in a similar fashion towards male employees.

31. The next day, Plaintiff reported the incident to Mr. Donatello, which resulted in a meeting between Volcano's HR department representative Bick Sellers, Mr. Donatello, and Plaintiff.

32. The company took no action against Huff in regard to his inappropriate behavior. This is again despite the fact that Huff had no authority to reprimand Plaintiff.

33. Thereafter, Volcano was acquired by Philips and, for approximately one year, Mr. Donatello continued to act as Plaintiff's supervisor.

34. In January 2016, Philips instituted internal realignments. This resulted in Huff becoming Plaintiff's immediate supervisor.

35. Plaintiff expressed her concerns about reporting to Huff to Mr. Donatello but again no action was taken to avoid the situation.

36. In March 2016, Huff began a pattern of animus directed at Plaintiff that has not been directed at Plaintiff's male colleagues.

37. Defendant Huff began alienating Plaintiff's clients, questioning physicians why they bought certain devices from Plaintiff's competition causing unnecessary strain on

4

Plaintiff's work. Upon information and belief, Huff did not engage in similar behavior towards Plaintiff's male counterparts and their clients and physicians.

38. From March 2016 through December 2016, Huff would call Plaintiff multiple times per week, often after business hours, on weekends and even while Plaintiff was on vacation/holiday, to question, intimidate and bully Plaintiff in regard to her activities and performance. These calls, and then the mandated Tuesday morning teleconferences, lasted well over an hour.

39. In April 2016, while on the premises of a high-profile account, Huff accused Plaintiff of having an affair with another coworker.

40. Defendant Huff's unfounded accusation shocked and humiliated Plaintiff, especially because it was made in front of a client.

41. Defendant Philips took no action to investigate the incident or reprimand Huff.

42. On or around May 4, 2016, Plaintiff took part in a teleconference with Huff, and members of Plaintiff's team who report directly to Plaintiff.

43. Huff again attacked Plaintiff's character and berated Plaintiff for over an hour while the members of Plaintiff's team, all of whom are male, were forced to listen.

44. Afterwards, Plaintiff received text messages from colleagues who were embarrassed by Huff's behavior.

45. Shortly thereafter, Plaintiff was engaged in negotiating the specifications of a company car, in which Plaintiff requested that Philips continue with a vehicle or mileage allowance and use public transportation rather than begin using a Philips car, which she did not need or have available parking for without exorbitant garage fees.

46. Upon information and belief, male counterparts were allowed to do exactly what Plaintiff was denied in regard to personal vehicles.

47. After Plaintiff finished her discussion with the Philips representatives she received a call from Huff.

48. Defendant Huff accused Plaintiff of "playing the victim" and threatened Plaintiff that she "might win the battle but lose the war." Huff further informed Plaintiff he would not permit her to expense the monthly garage fee for a Philips car. Plaintiff later found out Philips employees regularly expensed overnight parking fees for their Philips vehicles.

49. In October 2016, Plaintiff wrote to a Philips sales analyst in the attempt to rectify what she believed to be a simple error made by Huff.

50. This error related to a sale that Plaintiff had accomplished as part of her normal duties in March 2016. As part of this March sale, Plaintiff was not only entitled to the acknowledgment, but also the capital booking credit and commission for completing the sale.

51. Instead of giving Plaintiff the acknowledgment, capital booking credit towards quota and commission – which affected her ranking within Philips – Huff gave the acknowledgment and credit for the sale, as well as the commission for the sale, to Plaintiff's male counterpart Dan Warner.

52. In December 2016, Huff contacted Plaintiff randomly and insisted she take a job with Philips, insinuating that Plaintiff would have been "better suited" for that position instead of her current position, with no reasons offered as to why.

53. In early January 2017, Huff, for no clear reason, instituted a policy wherein he and Plaintiff must engage in a teleconference every Tuesday morning. Huff never offered any reasons as to why these teleconferences were necessary.

54. Plaintiff was the only employee supervised by Huff who was required to engage in such a policy. Upon information and belief, none of Plaintiff's male counterparts were forced to engage in these teleconferences.

55. Upon information and belief, the true reasons for these teleconferences was that Huff was looking for reasons to terminate Plaintiff or to goad her into resigning, as well as insult and humiliate Plaintiff.

56. On or about January 31, 2017, Huff forced Plaintiff to call him as part of the mandatory Tuesday morning calls. During the conversation on January 31, 2017, Huff told Plaintiff that she must sit in procedures and "cover lab days" two to three days a week. Asking Plaintiff to cover lab days was generally the responsibility of the cardiac account managers and clinical specialist. This change in duties directly interfered with Plaintiff's ability to seek out viable capital deals. Capital deals were large deals that in turn would boost Plaintiff's commissions and ranking. Cardiac account manager deals were significantly less valuable. During the meeting, Huff was fixated on Plaintiff's capital number and ranking and was using capital against Plaintiff in an attempt to create grounds to terminate Plaintiff.

57. On the morning of January 31, 2017, Plaintiff told Huff that she in fact already sat through procedures, was present during lab days, and that "we need to dispel the urban myth that Plaintiff does not go into accounts and support cases."

58. Defendant Huff became belligerent and verbally attacked Plaintiff.

59. Defendant Huff told Plaintiff that she should just resign.

60. On the evening of January 31, 2017, Huff sent Plaintiff her year-end evaluation.

61. Upon review, the evaluation contained inaccurate statements regarding Plaintiff's performance.

62. Plaintiff was afraid to discuss the matter with HR because Huff made it clear that he would retaliate against her should she do so.

63. Furthermore, Plaintiff knew Huff had retaliated against other women, including but not limited to Linda Morgan, who complained about him, going as far as to drive some of them out of the company.

64. Huff similarly denied Plaintiff the opportunity to speak with Huff and his own supervisor, Duane Wilder ("Wilder"), regarding Huff's treatment of her on December 16th, 2016 as well as on January 31st, 2017. On the instance of December 16th, 2016, Huff told Plaintiff "Wilder will think you're crazy."

65. Huff made it clear any efforts to address the situation would result in harsh retaliation against Plaintiff.

66. Upon information and belief, Wilder knew about Huff's erratic behavior but tacitly condoned said behavior by protecting Huff from any reprimand or repercussions.

67. Further exacerbating the situation, Huff sent out an email requesting each employee schedule a phone conference with him to discuss their year-end review.

68. Plaintiff did not respond right away due to being with a client.

69. As a further act of retaliation, Defendant Huff sent Plaintiff a threatening email regarding her failure to respond.

70. Shortly thereafter Plaintiff experienced extreme anxiety and suffered from panic attacks, insomnia and required medical treatment to address these conditions. All of these conditions stem from Defendant Huff's ongoing bullying and abuse of Plaintiff due to her gender.

71. As a result of the escalating harassment, in February of 2017, Plaintiff suffered a severe panic attack that required hospitalization.

72. As a result of her hospitalization, Plaintiff's doctor advised her to take short term disability leave as she required medication and frequent therapy visits to cope with the effects of Defendant Huff's discrimination, bullying, and harassment.

73. On or around February 13, 2017, Plaintiff filed a complaint with the E.E.O.C.

74. Defendant Huff, as he earlier threatened, began to retaliate against Plaintiff for doing so.

75. Huff stripped Plaintiff of important accounts and made her do weekly reporting that was previously not required. He also restricted her from talking with certain clients that Plaintiff had a longstanding relationship.

76. During the summer of 2017, Philips and Plaintiff's representative discussed her potentially returning to work.

77. At that time Plaintiff's representatives again advised Philips of Huff's behavior and requested to return under the supervision of David Donatello or any supervisor other than Huff.

78. Philips denied this request, claiming that they investigated Plaintiff's claims and found the allegations to be unfounded.

79. Upon information and belief, the investigation consisted of little more than interviewing Huff and employees of Philips who were afraid to speak out against Huff.

80. Later that summer 2017, Philips advised Plaintiff that she was no longer protected by FMLA, and unless she came back immediately they would fill her position.

81. Plaintiff was still unable to return due to still suffering from the severe anxiety and panic attacks caused by Huff and the thought of having to return to working for Huff made Plaintiff's situation worse.

82. Philips then assigned Plaintiff's job to Dan Warner and Vincent Barone, two men they knew would not have issues with Huff. It was later revealed that Huff had been assigning all of Plaintiff's accounts to men.

83. Upon information and belief, Barone and Warner were assigned to work under Huff because Phillips was well aware of his issues with women and wanted to avoid future litigation.

84. Plaintiff has tried to seek other employment, but it has been difficult because Huff damaged Plaintiff's reputation so severely that she could not return to the same area of sales that she worked hard over the years to cultivate.

85. Further complicating Plaintiff's job search is the fact that Huff has been actively defaming Plaintiff, telling others that Plaintiff left Philips because she was out on "mental leave" and that other employees should not talk to her.

86. This was brought to Plaintiff's attention by Philip Bissette, an Interventional X-Ray Specialist at Philips.

87. Plaintiff still suffers from panic attacks, insomnia and anxiety as a result of Huff's behavior.

88. Defendants' actions and conduct were intentional and intended to harm Plaintiff.

89. No reasonable person in Plaintiff's shoes should be expected to work under such harassing and retaliatory conditions.

90. Plaintiff feels emotionally overwhelmed, depressed, anxious and distraught which is due to the condescending, hostile and general unprofessional treatment that she received from her supervisors as a result of retaliation for the complaint made regarding illegal discriminatory conduct.

91. As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, Plaintiff suffered and continues to suffer severe emotional distress.

92. Plaintiff is experiencing severe anxiety and depression due to the discriminatory, unprofessional, degrading, condescending and hostile treatment towards Plaintiff by Defendants.

93. Defendants' actions were and are intended to create a hostile working environment that no reasonable person would tolerate.

94. It is clear that Defendants have a pattern and practice of discrimination.

95. As Defendants conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against Defendant. Plaintiff seeks reinstatement, back pay, front pay, all lost wages and earning capacity, punitive damages, damages for emotional distress, physical injuries, medical expenses and attorney's fees.

# AS A FIRST CAUSE OF ACTION
# FOR DISCRIMINATION UNDER TITLE VII
# (not against any individual Defendant)

96. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

97. Title VII states in relevant part as follows: SEC. 2000e-2. [Section 703] (a) Employer practices, It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

98. DEFENDANTS engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by allowing gender/sex discrimination, and causing a hostile work environment.

# AS A SECOND CAUSE OF ACTION
# FOR DISCRIMINATION UNDER TITLE VII
# (not against any individual Defendant)

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

100. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

101. DEFENDANTS engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of their opposition to the unlawful employment practices of DEFENDANTS.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK STATE LAW

102. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

103. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

"For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

104. DEFENDANTS engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding and abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK STATE LAW

105. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any

practices forbidden under this article."

106. DEFENDANTS engaged in an unlawful discriminatory practice by wrongfully retaliating against Plaintiff.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER NEW YORK STATE LAW

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

108. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

109. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding and abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER CITY LAW

110. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

111. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to

hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

112. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of Plaintiff's gender/sex, sexual harassment, disability, and hostile work environment.

113. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

## AS A SEVENTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER CITY LAW

114. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

115. The New York City Administrative Code Tide 8, §8-107(1)(e) provides that it shall be unlawful discriminatory practice: "For an employer . . , to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

116. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

## AS AN EIGHTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE

117.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

118.   The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

119.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS AN NINTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE
## SUPERVISORY LIABILITY

120.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

121.   Section 8-107(13) entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides:

a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section. b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

i. the employee or agent exercised managerial or supervisory responsibility; or

ii. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

iii. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

122. Defendants violated the above section as set forth herein.

## AS A TENTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## INTERFERENCE WITH PROTECTED RIGHTS

123. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

124. New York City Administrative Code Title 8-107(19) Interference with protected rights.

125. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

126. Defendants violated the section cited herein as set forth.

**WHEREFORE**, the Plaintiff demands the Court enter judgment in their favor and against the Defendants as follows:

A. Directing the Defendants to pay to the Plaintiff all compensatory, punitive, and liquidated damages to which she may be entitled;

B. Directing the Defendants to pay the Plaintiff attorneys fees should the Plaintiff be the prevailing party to this action;

C. Directing the Defendants to pay the costs and disbursements associated with this action; and,

D. Granting such other and further relief that to the Court seems just and proper.

Dated: Westbury, New York
May 22, 2018

                                               Yours, etc.

                                        *Jonathan Tand*
                                        Jonathan A. Tand, Esq.
                                        JONATHAN A. TAND & ASSOCIATES
                                        1025 Old Country Road, Suite 314
                                        Westbury, N.Y. 11590
                                        (516) 393-9151